## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| JASON BOOTH, derivatively on behalf of 3D SYSTEMS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ABRAHAM N. REICHENTAL, DAMON J. GREGOIRE, CHARLES W. HULL, DANIEL S. VAN RIPER, G. WALTER LOEWENBAUM, II, JIM D. KEVER, KAREN E. WELKE, KEVIN S. MOORE, PETER H. DIAMANDIS, WILLIAM D. HUMES, and WILLIAM E. CURRAN,<br><br>Defendants,<br><br>and<br><br>3D SYSTEMS CORPORATION,<br><br>Nominal Defendant. | Civil Action No.<br><br><br><br><br><br><br><br><br><br><br><br><br><br>__JURY TRIAL DEMANDED__ |

## __VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT__

1.      Plaintiff Jason Booth ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant 3D Systems Corporation ("3D" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment from April 2013 through the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, South Carolina-based 3D is an international 3D printing company that provides 3D printers, print materials, custom-parts, and software.  During

the Relevant Period, Defendants drove up 3D's stock price by issuing false and misleading statements concerning: (i) the Company's ability to increase the capacity of its metal printing business; (ii) the demand for the Company's consumer products; (iii) the value of multiple companies 3D was acquiring; and (iv) the Company's expected earnings.

3.      For example, on October 29, 2013, the Company's Chief Executive Officer ("CEO") and President, Defendant Abraham N. Reichental ("Reichental"), proclaimed that the Company had "decided to triple [its] manufacturing capacity over the next 12 months, as well as accelerate the development of additional direct metal 3D printer models."  In addition, on February 28, 2014, Defendant Reichental represented that "our plan is [to] quadruple [direct metal printing] sales over the next 12 to 18 months."  Defendant Reichental likewise repeatedly touted the strategic value of the Company's recent acquisitions.

4.      Contrary to their positive statements concerning the Company's growth, however, Defendants had no basis to represent that the Company would be able to triple its metal printing capacity and/or quadruple direct metal printing sales.  Specifically, as was later disclosed, many of the Company's acquisitions (commenced under Defendants' direction and on their watch) were not strategically acquired in an effort to boost revenue through acquisition and would require significant additional investment to integrate into 3D.

5.      Defendants could not conceal the Company's serious problems indefinitely.  For instance, the truth began to emerge on July 31, 2014 when Defendants caused the Company to issue its second quarter results whereby the Company missed analysts' expectations and reported revenue of $151.5 million on delays in the rollout of new products and disappointing guidance.

6.      On this news, the price of the Company's stock fell from a close of $56.07 per share on July 30, 2014 to a close of $47.93 per share on August 1, 2014, a two-day decline of

14.5%.

7.      The full truth was revealed on October 22, 2014, when Defendants announced disappointing preliminary third quarter results and lower full year revenue and earnings guidance for the Company.  In a press release issued that same day, Defendants blamed the Company's disappointing results on capacity constraints for its direct metal printers.

8.      On this news, the price of the Company's stock fell from a close of $43.38 per share on October 21, 2014 to a close $36.67 per share on October 22, 2014, a one-day decline of approximately 15.5%.

9.      As a result of Defendants' wrongful acts and omissions, 3D shares traded at artificially inflated prices during the Relevant Period, which (as discussed in detail herein) ultimately permitted the Insider Selling Defendants (defined herein) to reap over **$85 million** in proceeds while in possession of material, adverse, non-public information.  Further, the price of the Company's stock has continued to be decimated, with the Company's shares currently trading for around $12 per share.  Accordingly, as a result of Defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.      Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  The Company is incorporated in this

District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

12.     Plaintiff is a current shareholder of 3D and has continuously held 3D stock since March 2013.  Plaintiff is a citizen of Colorado.

13.     Nominal Defendant 3D is a Delaware corporation with its principal executive offices located at 333 Three D Systems Circle, Rock Hill, SC 29730.  According to its public filings, 3D is an international 3D printing company that provides 3D printers, print materials, custom parts, and software.

14.     Defendant Reichental has served as the Company's President and CEO since September 2003.  In addition, Defendant Reichental has served as a director of the Company since September 2003.  In the Company's Proxy Statement filed with the United States Securities and Exchange Commission (the "SEC") on March 24, 2015 (the "2015 Proxy"), Defendants have admitted that Defendant Reichental is not independent.  Upon information and belief, Defendant Reichental is a citizen of South Carolina.

15.     Defendant Damon J. Gregoire ("Gregoire") has served as the Company's Executive Vice President of Mergers & Acquisitions since November 2014.  In addition, Defendant Gregoire previously served as the Company's Chief Financial Officer ("CFO") from April 25, 2007 to November 11, 2014, and Principal Accounting Officer and Vice President until November 11, 2014.  Upon information and belief, Defendant Gregoire is a citizen of South Carolina.

16.     Defendant Charles W. Hull ("Hull") is a founder of the Company and has served as the Company's Chief Technology Officer since 1997.  In addition, Defendant Hull has served

4

as the Company's Executive Vice President since 2000.  In the 2015 Proxy, Defendants have admitted that Defendant Hull is not independent.  Upon information and belief, Defendant Hull is a citizen of South Carolina.

17.     Defendant Daniel S. Van Riper ("Van Riper") has served as a director of the Company since 2004.  In addition, Defendant Van Riper has served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, Defendant Van Riper is a citizen of Florida

18.     Defendant G. Walter Loewenbaum, II ("Loewenbaum") has served as Chairman of the Board since 1999.  Upon information and belief, Defendant Loewenbaum is a citizen of Texas.

19.     Defendant Jim D. Kever ("Kever") has served as a director of the Company since 1996.  Upon information and belief, Defendant Kever is a citizen of Tennessee.

20.     Defendant Karen E. Welke ("Welke") has served as a director of the Company since 2008.  Upon information and belief, Defendant Welke is a citizen of Minnesota.

21.     Defendant Kevin S. Moore ("Moore") has served as a director of the Company since 1999.  In addition, Defendant Moore has served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, Defendant Moore is a citizen of New York.

22.     Defendant Peter H. Diamandis ("Diamandis") has served as a director of the Company since 2013.  In addition, Defendant Diamandis is the co-Founder & Executive Chairman of Singularity University ("Singularity"), which, according to the 2015 Proxy, the Board approved a $1 million partnership and sponsorship fee for in connection with becoming Singularity's Title Partner.  Upon information and belief, Defendant Diamandis is a citizen of

California.

23.     Defendant William D. Humes ("Humes") has served as a director of the Company since 2014.  In addition, Defendant Humes is the CFO of Ingram Micro Inc. ("Ingram Micro").  According to the 2015 Proxy, in 2014, the Company sold $506,428 worth of products to Ingram Micro, which also serves as one of the Company's distributors.  Upon information and belief, Defendant Humes is a citizen of California.

24.     Defendant William E. Curran ("Curran") has served as a director of the Company since 2008.  In addition, Defendant Curran has served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, Defendant Curran is a citizen of New York.

25.     Collectively, Defendants Reichental, Gregoire, Hull, Van Riper, Loewenbaum, Kever, Welke, Moore, Diamandis, Humes, and Curran shall be referred to herein as "Defendants."

26.     Collectively, Defendants Van Riper, Moore, and Curran shall be referred to as the "Audit Committee Defendants."

27.     Collectively, Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper, and Kever shall be referred to as the "Insider Selling Defendants."

**DEFENDANTS' DUTIES**

28.     By reason of their positions as officers, directors, and/or fiduciaries of 3D and because of their ability to control the business and corporate affairs of 3D, Defendants owed 3D and its shareholders fiduciary obligations of due care, good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage 3D in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of

6

3D and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to 3D and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     Defendants, because of their positions of control and authority as directors and/or officers of 3D, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with 3D, each of the Defendants had knowledge of material non-public information regarding the Company.

30.     To discharge their duties, the officers and directors of 3D were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of 3D were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the

misconduct and prevent its recurrence.

31.     Pursuant to the Company's Code of Conduct revised on April 2013 (the "Code of Conduct"), "[a]ll reports or responses to questions provided within the organization or to outsiders (customers, suppliers, financial institutions, governmental agencies of all kinds, other organizations and/or people with a need or right to receive information) are expected to be truthful, accurate and not misleading in any way."  Further, the Code of Conduct states that the Company is "committed to maintaining strong internal controls and complete and accurate books and records."  Additionally, the Code of Conduct states that "it is a violation of U.S. law to buy or sell 3D Systems stock, or the securities of any other company with which we have a relationship, on the basis of material information not available to the public."

32.     Pursuant to the Company's Insider Trading Compliance Policy (the "Insider Trading Policy"), employees, officers, and directors "may not buy, sell or otherwise trade in the securities of the Company, directly or through family members or other persons or entities, at any time you are aware of material non-public information relating to the Company."  Additionally, the Insider Trading Policy requires that all trades by the Company's officers and directors be "pre-cleared" by the Company's Chief Legal Officer or Assistant General Counsel.  The Insider Trading Policy specifically states that Defendants "may not . . . carry out any transaction in the Company's securities during the period beginning on the 21st day prior to the last day of each calendar quarter (March 10, June 9, September 9, and December 10) and ending at the close of business on the second full trading day following the release of the Company's earnings for that quarter."

33.     Pursuant to the terms of the Audit Committee's Charter, which was amended and restated on May 15, 2012 (the "Audit Committee Charter"), the Audit Committee Defendants

were responsible for, *inter alia*:

    a.  Reviewing the Company's periodic reports with members of management, the internal auditor, and the independent auditor prior to their filing with the SEC;

    b.  Reviewing with management and the independent auditor the Company's annual financial statements and related footnotes;

    c.  Review with the General Counsel legal and regulatory matters that may have a material impact on the Company's financial statements, related Company compliance policies, and programs and reports received from regulators;

    d.  Reviewing with management any significant changes to GAAP policies or standards;

    e.  Reviewing with management and the independent auditor at least periodically the Company's critical accounting policies;

    f.  Reviewing disclosures in the Company's financial statements and periodic reports of transactions between the Company and officers and directors, or affiliates of officers or directors, or transactions that are not a normal part of the Company's business;

    g.  Conducting or authorizing investigations into any matters within the Audit Committee's scope of responsibilities;

    h.  Inquiring of management, the internal auditor, and the independent auditor about significant risks or exposures and assess the steps that management has taken to minimize such risk to the Company; and

    i.  Obtaining advice and assistance from internal or outside legal, accounting or other advisors at the expense of the Company, as it deems appropriate to assist

the Audit Committee in performing its functions.

## SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company and its Business

34.    According to its public filings, 3D was founded in 1986 and initially developed expensive 3D printers used in aerospace and automotive manufacturing to develop prototype parts, in what was then a niche market.  Currently, the Company, through its subsidiaries, develops, manufactures, and markets 3D printers, print materials, on-demand custom parts services, and 3D authoring-solutions for professionals and consumers.  The Company also provides content creation and design productivity software platforms.  Its products are most often used in commercial settings like the aerospace/defense, healthcare and automotive industries, as well as consumer applications and hobbies.

35.    The 3D printing process starts with a digitized 3D image of the part to be made. The printers then apply layer upon layer of materials to fabricate a physical object.  As their capabilities rose and their prices fell, 3D printers gained greater acceptance in many industries, including dental and prosthetics.

### B.    Defendants' Relevant Period False and Misleading Statements

36.    On April 30, 2013, Defendants caused the Company to issue a press release entitled "3D Systems Reports Q1 2013 Results," which reported that the Company's "first quarter revenue grew 31% from the prior year to $102.1 million on a 61% increase in printers' and other products revenue and 22.1% overall organic growth.  Gross profit increased 38% and gross profit margin expanded 250 basis points to 52.4%, contributing to non-GAAP net income improvement of 43% over the 2012 quarter to $18.9 million, and GAAP net income of $5.9 million."  Defendant Reichental was quoted in the press release:

"We are very pleased to report outstanding quarterly results on higher printers' sales," said Avi Reichental, 3D Systems' President and Chief Executive Officer. We believe that the vibrancy of our diversified portfolio, productivity of our channels and effectiveness of our strategic growth initiatives will continue to fuel our progress and results."

\*\*\*

"We continue to experience positive sales momentum that is shaped primarily by increased demand from advanced manufacturing activities. While we may face lingering economic uncertainties in parts of the world, we expect to continue to benefit from robust R&D and manufacturing spending by our customers worldwide[.]"

37.     On May 3, 2013, while in possession of material, adverse, non-public information, Defendant Van Riper sold over 10,300 shares of his personally held 3D stock at approximately $41 per share, for proceeds of over $426,000.[1]

38.     Less than two weeks later, on May 15, 2013, while in possession of material, adverse, non-public information, many of the Insider Selling Defendants sold their 3D shares at $40.00 per share.  For instance, on that day, Defendant Reichental sold 400,000 of his 3D shares for proceeds of $16 million.  Defendant Gregoire sold 45,000 of his 3D shares for proceeds of $1.8 million.  Defendant Loewenbaum, individually and through entities with which he was affiliated, sold a collective 800,000 3D shares for total proceeds of $32 million.  Defendant Kever sold 38,000 of his 3D shares for proceeds of $1.52 million.

39.     Two days after those transactions, on May 17, 2013, while in possession of material, adverse, non-public information, Defendant Van Riper sold a total of 17,220 of his personally held 3D shares at prices between $45.61 per share and $46.05 per share, for proceeds of over $787,000.

40.     On July 30, 2013, Defendants caused the Company to issue a press release

---

[1] The specific details of this and all other relevant insider transaction are set forth in greater detail herein.

entitled "3D Systems Reports Q2 2013 Results," which announced that the Company's "second quarter revenue grew 45% from the prior year to $120.8 million on a 108% increase in printers' and other products revenue and 30% overall organic growth resulting in GAAP earnings of $0.10 per share and non-GAAP earnings of $0.20 per share." Defendant Reichental was quoted in the press release:

> "We are pleased to report record revenue and expanded gross profit margin," said Avi Reichental, 3D Systems' President and Chief Executive Officer. "We believe that our effective advanced manufacturing and consumer growth initiatives are fueling our growth."
>
> ***
>
> "Factoring the significant increase of inbound interest, in the period we made the affirmative decision to step up certain discretionary expenses to accelerate the adoption of our products and services," added Reichental
>
> ***
>
> "We are experiencing heavy demand for our advanced manufacturing and consumer solutions and expect to continue to benefit from accelerated adoption of our products and services that is driven by our customers' robust R&D and manufacturing spending worldwide," concluded Reichental.

41.     Also on July 30, 2013, Defendants caused the Company to file with the SEC a quarterly report on Form 10-Q, which reiterated the financial results announced in the July 30, 2013 press release. The Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by Defendants Reichental and Gregoire. These SOX Certifications, which attested to the adequacy of the Company's internal controls, set forth:

I, [Abraham N. Reichental/Damon J. Gregoire], certify that:

1)      I have reviewed this report on Form 10-Q of 3D Systems Corporation;

2)      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*\*\*

I, [Abraham N. Reichental, the Principal Executive Officer of the Issuer/ Damon J. Gregoire, the Principal Financial Officer of the Issuer], certify that, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge:

i. the Form 10-Q fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

ii. the information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Issuer.

42. On October 29, 2013, Defendants caused the Company to issue a press release entitled "3D Systems Reports Q3 2013 Results," which announced that the Company's "third quarter revenue grew 50% from the prior year to a record $135.7 million on a 76% increase in printers' and other products revenue and 30% overall organic growth, resulting in GAAP earnings of $0.17 per share and non-GAAP earnings of $0.26 per share." Defendant Reichental was quoted in the press release:

We are very pleased to report another record revenue quarter on unprecedented printer units demand that more than tripled last year's unit sales.

\*\*\*

Stronger materials sales, increased advanced manufacturing activities and meaningful consumer products revenue contribution fueled our growth.

43. On the same day, Defendants held the Company's third quarter 2013 Earnings Call. Defendant Reichental represented the following regarding the Company's direct metal capacity:

Specifically, we sold out our current direct metal printers manufacturing capacity and decided to triple our manufacturing capacity over the next 12 months, as well as accelerate the development of additional direct metal 3D printer models.

\* \* \*

Specifically, to the direct metal question, the plan is afoot to expand our capacity in every quarter. It's a multipronged approach to do that, and our expectation is to get ourselves into a position where we can manufacture over the next 12 months three times the amount that we were able to manufacture in 2013.

\* \* \*

We think that metal printers as a category is and will continue to be accretive to our printers' margins. And we certainly expect metal materials to be accretive to our materials margins. And we believe that the kind of investments we're undertaking in metals and in also fast tracking a group of nearly half a dozen new printers that we plan to introduce in the next few months, many of which are groundbreaking advanced manufacturing printers, will significantly enhance our recurring revenue generation capacity post those periods, namely materials at increasingly higher margins.

44.     Defendant Reichental stated the following regarding the Company's numerous

acquisitions:

During the third quarter, we completed several acquisitions in support of our strategic growth initiatives. CRDM expands our global quick parts footprint and extends our U.K. presence. TeamPlatform, a powerful online collaboration tool, strengthens our consumer and professional design and communications capabilities, and the Sugar Lab speeds up our entry into food printing.

We also acquired 82% of Phenix Systems, adding proprietary direct metal printing capabilities to our advanced manufacturing portfolio. We believe that our accelerated growth rate reflects the strength of our diversified portfolio, the productivity of our channels, and the effectiveness of our strategic initiatives.

\* \* \*

The acquisition of TeamPlatform strengthens our consumer and professional design and communication capabilities with unique and powerful online collaboration tools and the Sugar Lab accelerates our food printing development and marketing initiatives.

45.     Also on October 29, 2013, Defendants caused the Company to file with the SEC a

quarterly report on Form 10-Q.  The Form 10-Q reiterated the Company's financial results announced that same day and also contained SOX Certifications which were substantially similar to those set forth above.

46.     After Defendants made such rosy statements regarding the Company's products during 2013, 3D stock soared.  For instance, by mid-November 2013, 3D shares were up over 40%, reaching as high as $80 per share on November 18, 2013.  With the stock soaring, certain of the Insider Selling Defendants took advantage of the inflated stock price.  For instance, on November 5, 2013, while in possession of material, adverse, non-public information, Defendant Moore sold 15,000 of his 3D shares at $68.44 per share, for proceeds of over $1.026 million.  On November 11, 2013, Defendant Loewenbaum, individually and through entities with which he was affiliated, sold a total of 80,000 shares of 3D stock at prices ranging from $76.25 per share to $76.74 per share, for proceeds of over $6.1 million.  That same day, while in possession of material, adverse, non-public information, Defendant Gregoire sold 45,000 shares of his 3D stock at prices ranging from $79.92 per share and $80.09 per share, for total proceeds of $3.6 million.

47.     One month later, on December 13, 2013, Defendant Reichental sold 25,000 shares of his 3D stock at $80.91 per share, for proceeds of over $2 million.

48.     On January 15, 2014, despite 3D's competitors' lower estimates, Defendants stated in presentation slides at the 2014 Needham Conference, made available in an SEC regulatory filing, that they expected the Company to be able to double its revenue "over the next couple of year powered by about 30% organic growth."

49.     On February 28, 2014, after Defendants announced the Company's fourth quarter and full year 2013 results, 3D's shares climbed following Defendants' projection of a doubling

of the Company's revenue up to $1 billion in revenue in 2015, up from $513 million in 2013.
For full year 2014, Defendants reiterated their previous revenue guidance of $680 million to
$720 million, and their prior full year 2014 EPS view of 0.73 to 0.85.  On these representations,
shares of 3D surged 6.8%, carrying the stock to $79.77 per share after opening at $75.96 per
share.

50.     That same day, Defendants caused the Company to file with the SEC an Annual
Report on Form 10-K.  The Form 10-K reiterated the Company's financial results announced
that same day and also contained SOX Certifications that were substantially similar to those set
forth above.

51.     Also on that same day, during the Company's fourth quarter 2013 Results
Earnings Call, Defendant Reichental made the following representations regarding 3D's
acquisitions:

> We expect the recent acquisition of Village Plastics to bolster our consumer
> material development and margins and the alliances and partnerships with
> demand experts in toys and food to position us for leadership in those categories.
> Furthermore, we expect the acquisitions of Gentle Giant and Digital Playspace to
> enhance our brand publishing capabilities and the attractiveness of our consumer
> and retail platform.

52.     Additionally, during the fourth quarter 2013 Results Earnings Call, Defendant
Reichental reiterated the Company's confidence in its direct metal capacity:

> Based on our current lineup of direct metal printers, customer demand and
> planned capacity expansions, we expect our direct metals business to generate
> between $25 million and $50 million of revenue in 2014. For metals, this
> represents the beginning.

> Some may view this as a small niche, however, we believe that direct metal
> printing represents one of the most important and exciting advanced
> manufacturing growth opportunities over the next few years and our plan is as
> much as quadruple sales over the next 12 to 18 months. We believe that plan is
> fully consistent with the growing demand of our expanding direct metal lineup.

53.     On the same day, analyst Canaccord Genuity raised 3D's price target to $100 from $75, citing the Company's guidance and the potential for multiple expansion given the Company's expectations for positive leverage in 2015.  Citigroup also raised 3D's price target to $90 from $78.

54.     Less than a week later, between March 5, 2014 and March 6, 2014, while in possession of material, adverse, non-public information, Defendant Loewenbaum (individually and through entities with which he was affiliated) sold a total of 71,479 shares of 3D stock at prices between $70.10 per share and $72.90 per share, for proceeds of $5.12 million.

55.     On March 14, 2014, while in possession of material, adverse, non-public information, Defendant Reichental sold 66,700 shares of his 3D stock at $60.11 per share, for proceeds of over $4 million.

56.     On April 29, 2014, during the Company's first quarter 2014 Earnings Call, Defendant Reichental also continued to tout the Company's direct metal sales and expanding capacity in stating the following:

> Growing Direct Metal 3D printer sales, again outstripped our manufacturing capacity during the first quarter, even as we continued to add capacity and from previous year to our increased total printers backlog.
>
> * * *
>
> In the first quarter, 3D printers and other products revenue grew 53% to $60.8 million and made up 41% of total revenue. 3D printers alone contributed $50.7 million growing some 60% over the 2013 quarter. All our printer categories experienced strong demand and our effective sales of marketing Direct Metal printers campaign continue to produce greater demand, once again outpacing our manufacturing capacity even as we continue to add capacity.
>
> * * *
>
> We continue to expand manufacturing capacity across our portfolio including accelerated expansion of our Direct Metals manufacturing as demand from industrial companies continues to outpace our capacity. Healthcare, it remains one

of our fastest growing verticals as we continually focus on expanding our applications and reach. Inline with that in April, we acquired Medical Modeling, a leading provider of 3D printing enabled patient-specific medical devices and personalized surgical treatments including proprietary, virtual, surgical planning and clinical transfer tools.

* * *

We entered the second quarter of 2014 with positive sales momentum and increased backlog driven by continued strong demand for advanced manufacturing activities across all of our categories. As our new faster and more advanced 3D printers and material gain traction, we expect accelerated revenue growth through the second half of this year. We continue to view direct metal printing as a very important and exciting manufacturing growth opportunity and plan to quadruple direct metal printer sales over the next 12 to 18 months.

57.     On May 7, 2014, while in possession of material, adverse, non-public information, Defendant Gregoire sold 22,500 shares of his 3D stock at approximately $49.00 per share, for proceeds of over $1.1 million.

58.     Less than two weeks later, on May 19, 2014, while in possession of material, adverse, non-public information, Defendant Hull sold 7,500 shares of his 3D stock at prices between $48.40 per share and $49.07 per share, for proceeds of $366,000.   Defendant Hull continued to sell his 3D shares over the following months.   For instance, on June 16, 2014, Defendant Hull sold 7,500 shares of his 3D stock at prices between $50.34 per share and $51.02 per share, for proceeds of $380,000.   On July 21, 2014, Defendant Hull sold 7,500 shares of his 3D stock at $56.54 per share, for proceeds of over $424,000.

**C.**     **The Truth Begins to Emerge**

59.     On July 31, 2014, Defendants caused the Company to issue a press release entitled "3D Systems Reports Second Quarter and Six Months 2014 Financial Results," which reported that the Company's second quarter results missed analysts' estimates on delays in the rollout of new products.   The July 31, 2014 press release stated, in pertinent part:

ROCK HILL, South Carolina – July 31, 2014 -3D Systems Corporation (NYSE: DDD) announced today that its second quarter revenue grew $30.7 million, or 25%, from the prior year to $151.5 million on strong demand for its design and manufacturing printers, materials and services, resulting in second quarter GAAP earnings of $0.02 per share and non-GAAP earnings of $0.16 per share.

Organic growth amounted to 10% as additional orders-in-hand, including $23.1 million of printer orders, a 29% sequential increase over the March backlog for printers, expanded the company's second quarter total backlog to a record $31.9 million.

"We are pleased that unit sales of our design and manufacturing printers increased 126% and helped fuel a 30% increase in materials revenue. We believe that the record order book that we exited the quarter with reflects the vibrancy of our business and our organic growth trajectory," said Avi Reichental, 3DS' President and Chief Executive Officer.

*** 

"While transitional forces temporarily pressured our gross profit margin, a detailed examination of the specific drivers, confirms that the fundamentals of our business are intact and our gross profit margins are poised to rebound and resume their expansion trajectory," continued Reichental.

The company effectively kept its operating expenses flat, on a sequential basis, even with continued investments in R&D, sales, marketing and manufacturing capacity. The company generated $19.0 million of cash from operations during the second quarter as returns on its recent investments began to materialize and enterprise-wide integration synergies continued to accrue. The company ended the quarter with $570.3 million cash on hand, inclusive of an equity raise completed earlier in the quarter.

"As we advance our market leadership and scale in key verticals through our increased investments, our progress is ahead of schedule and our enterprise-wide synergies are already generating substantial cash from operations," continued Reichental.

*** 

"Consistent with our historical performance, we expect to generate a higher portion of our revenue during the second half on rebounding margins. Record bookings for our design and manufacturing printers together with rising orders for our consumer products provides us with confidence in our ability to achieve our 2014 guidance," concluded Reichental.

60.     According to *Business Insider*, the Company's second quarter EPS came in at

$0.16 a share versus forecasts for $0.18.  Further, the Company's reported $151.5 million in revenues against Defendants' expected $162.3 million.  Finally, the Company's inventory climbed to $90 million versus $86 million forecast, and gross margin came in at 47.8% versus 51% forecast.

61.     Significantly, organic growth sunk to 10% from 30% in previous quarters, while the materials revenue increased 30%, which is a slowdown from 41% growth from the first quarter.  Finally, consumer revenue was $7.4 million compared to $9.7 million in first quarter as delayed products availability held consumer revenue growth down, although bookings grew by $7.7 million.

62.     On this news, the price of the Company's stock fell from a close of $56.07 per share on July 30, 2014 to a close of $47.93 per share on August 1, 2014, a two-day decline of 14.5%.

63.     Nonetheless, the Company's shares continued to trade at inflated prices.  As such, certain of the Insider Selling Defendants took advantage of the artificially inflated price by selling additional shares.  For instance, on August 18, 2014, while in possession of material, adverse, non-public information, Defendant Hull sold 7,500 shares of his 3D stock at $49.07 per share, for proceeds of over $368,000.  On August 27, 2014, while in possession of material, adverse, non-public information, Defendant Gregoire sold 50,000 shares of his 3D stock at $52.72 per share, for proceeds of over $2.6 million.  On August 29, 2014, while in possession of material, adverse, non-public information, Defendant Reichental sold 52,300 shares of his 3D stock at $53.20 per share, for proceeds of over $2.7 million.

64.     On September 15, 2014, while in possession of material, adverse, non-public information, Defendant Hull sold 7,500 shares of his 3D stock at prices between $49.31 per share

and $51.64 per share, for proceeds of $379,000.  Then, on October 20, 2014, Defendant Hull sold an additional 7,500 shares of his 3D stock at $41.90 per share, for proceeds of $314,000.

65.     On October 22, 2014, Defendants caused the Company to issue a press release entitled "3D Systems Announces Preliminary Third Quarter 2014 Results," which reported the Company's financial results for the third quarter of 2014, which again were well below expectations.  Defendants again warned that continued manufacturing capacity constraints for its direct metal printers would dent its third-quarter results.  Defendants also lowered the Company's 2014 revenue forecast by roughly 7%.  The shortfall was blamed on problems with manufacturing direct metal printers and "delayed availability" of some consumer products.

66.     In the third quarter of 2014, Defendants expected the Company's revenues to come in between $164 million and $169 million, which was significantly below Wall Street expectations of approximately $186 million according to *Business Insider*.  Defendants also said the Company expected adjusted EPS in the third quarter to be $0.16 to $0.19, below expectations for $0.21, and cut the Company's full-year revenue and profit outlook, saying that they expected Company revenue to total $650 million to $690 million, again below Wall Street expectations of approximately $708 million.

67.     In the Company's October 22, 2014 press release, Defendants stated, "[s]trengthening sales of the company's design, manufacturing and healthcare products and services were not enough to overcome the revenue shortfall from the continued manufacturing capacity constraints for its direct metals printers and delayed availability of its newest consumer products."

68.     Defendant Reichental stated the following regarding 3D's capacity:

We are disappointed that we failed to fully capitalize on the robust demand for our direct metal and consumer products during the quarter.

> While we worked very hard to deliver these products sooner, achieving manufacturing scale, quality and user experience targets took significantly longer than we had anticipated.

69.     Also on October 22, 2014, Troy Jensen, a Piper Jaffray analyst, stated that "[a] spree of acquisitions has clouded the extent of 3D Systems' growth," and "[w]e've been cautious on 3D for a while, they've had a fairly aggressive rollup strategy."

70.     On this news, the price of the Company's stock fell from a close of $43.38 per share on October 21, 2014 to close at $36.67 per share on October 22, 2014, a one-day decline of approximately 15.5%.

71.     On November 19, 2014, while in possession of material, adverse, non-public information, Defendant Gregoire sold 45,000 shares of his 3D stock at $35.33 per share, for proceeds of over $1.5 million.  That same day, Defendant Hull sold 10,000 shares of his 3D stock at $36.05 per share, for proceeds of over $360,000.

72.     Significantly, matters for the Company have not improved since Defendants' July 31, 2014 and October 22, 2014 revelations.  For instance, according to the Company's Form 10-K, filed on February 26, 2015, direct metals revenue only increased by 178% in 2014.

73.     On the same day, during the Company's Q4 2014 Results Earnings Call, Defendant Reichental admitted Defendants' failures and stated the following:

> We are definitely disappointed that we were not able to fully capitalize faster on the strength of our portfolio and closed the revenue gap that was caused by delayed consumer product and direct metal capacity constraints.

74.     Stated simply, 3D, under Defendants' direction and on their watch, did not triple the Company's direct metal printing sales, let alone quadruple sales, as Defendants had previously represented.

75.     Additionally, the price of the Company's shares has continued to be decimated,

and the Company's stock currently trades for around $12 per share.  Accordingly, as a result of Defendants' breaches, the Company has been damaged.

**D.      The Insider Selling Defendants' Illicit Insider Sales**

76.      During the Relevant Period, the Insider Selling Defendants possessed non-public, adverse, material information regarding 3D and reaped improper financial benefits through insider trading, selling significant portions of their 3D stock while the Company's stock traded at artificially inflated prices.

77.      In particular, the Insider Selling Defendants collectively sold over ***1.8 million*** shares of 3D stock for over ***$85 million*** in proceeds during the Relevant Period.  The Insider Selling Defendants' illicit and improper insider sales based on their possession of non-public, adverse, material information regarding 3D during the Relevant Period are listed below as follows:

| Defendant | Dates of Sales | Shares Sold | Price Range | Gross Proceeds |
|---|---|---|---|---|
| Reichental | 5/15/13 | 400,000 | $40 | $16,000,000 |
|  | 12/13/13 | 25,000 | $80.91 | $2,022,750 |
|  | 3/14/14 | 66,700 | $60.11 | $4,009,337 |
|  | 8/29/14 | 52,300 | $53.20 | $2,782,360 |
| **Total** |  | **544,000** |  | **$24,814,447** |
| Gregoire | 5/15/13 | 45,000 | $40 | $1,800,000 |
|  | 11/15/13 | 45,000 | $79.92-$80.09 | $3,600,000 |
|  | 5/7/14 | 22,500 | $49.00-$49.02 | $1,103,000 |
|  | 8/27/14 | 50,000 | $52.72 | $2,636,000 |
|  | 11/19/14 | 45,000 | $35.33 | $1,589,850 |
| **Total** |  | **207,500** |  | **$10,728,850** |
| Hull[2] | 5/19/14 | 7,500 | $48.40-$49.07 | $366,000 |

---

[2] Certain of Defendant Hull's insider sales were made pursuant to a Rule 10b5-1 sales plan.

| | 6/16/14 | 7,500 | $50.34-$51.02 | $380,000 |
|---|---|---|---|---|
| | 7/21/14 | 7,500 | $56.54 | $424,050 |
| | 8/18/14 | 7,500 | $49.07 | $368,025 |
| | 9/15/14 | 7,500 | $49.31-$51.64 | $379,000 |
| | 10/20/14 | 7,500 | $41.90 | $314,250 |
| | 11/19/14 | 10,000 | $36.05 | $360,500 |
| **Total** | | **55,000** | | **$2,591,825** |
| Loewenbaum | 5/15/13 | 500,000 | $40 | $20,000,000 |
| | 5/15/13 | 150,000 | $40 | $6,000,000[3] |
| | 5/15/13 | 150,000 | $40 | $6,000,000 |
| | 11/11/13 | 50,000 | $76.74 | $3,836,999 |
| | 11/11/13 | 30,000 | $76.25 | $2,287,500 |
| | 3/5/14 | 50,000 | $70.85-$72.90 | $3,594,000 |
| | 3/5/14 | 20,000 | $70.92-$71.25 | $1,422,000 |
| | 3/6/14 | 1,479 | $70.10-$70.14 | $104,000 |
| **Total** | | **951,479** | | **$43,244,499** |
| Moore | 11/5/13 | 15,000 | $68.44 | $1,026,600 |
| **Total** | | **15,000** | | **$1,026,600** |
| Van Riper | 5/3/13 | 10,371 | $41 | $425,211 |
| | 5/3/13 | 22 | $41.08 | $904 |
| | 5/17/13 | 2,220 | $45.79 | $100,738 |
| | 5/17/13 | 5,000 | $45.73 | $228,650 |
| | 5/17/13 | 5,000 | $46.05 | $230,250 |
| | 5/17/13 | 5,000 | $45.61 | $228,050 |
| **Total** | | **27,613** | | **$1,441,853** |
| Kever | 5/15/13 | 38,000 | $40 | $1,520,000 |

---

[3] According to the Form 4 filed with the SEC in connection with this sale (and certain other sales by Defendant Loewenbaum), the proceeds of this sale went into a trust which Defendant Loewenbaum (or, in some other cases, his wife) serves as trustee; however Defendant Loewenbaum "disclaims beneficial ownership of these securities except to the extent of any pecuniary interest therein."

| Total | | 38,000 | | $1,520,000 |
| Grand Total | | 1,838,592 | | $85,368,074 |

## DERIVATIVE AND DEMAND ALLEGATIONS

78.     Plaintiff brings this action derivatively in the right and for the benefit of 3D to redress the breaches of fiduciary duty and other violations of law by Defendants.

79.     Plaintiff will adequately and fairly represent the interests of 3D and its shareholders in enforcing and prosecuting its rights.

80.     The Board currently consists of the following ten (10) directors: Defendants Reichental, Hull, Van Riper, Loewenbaum, Kever, Welke, Moore, Diamandis, Humes, and Curran.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons that follow.

### A.     Demand is Futile as to Defendants Reichental, Hull, Loewenbaum, <u>Kever, Moore, and Van Riper Due to Their Illicit Insider Sales</u>

81.     A majority of the members of the Board are interested and/or face a substantial likelihood of liability in connection with their illicit insider stock sales discussed above. Significantly, because the following members of the Board comprise a majority of the Board, demand is excused on this basis alone:

> a.     During the Relevant Period, Defendant Reichental illicitly sold shares of 3D stock for proceeds of almost $29 million while in possession of material, adverse, non-public information, during a time in which 3D's stock was artificially inflated due to Defendants' false and misleading statements.  As a result of these illicit sales, Defendant Reichental received direct financial benefits not shared with 3D's shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales,

Defendant Reichental violated the Company's Code of Conduct and Insider Trading Policy.  Further, Defendant Reichental is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales;

b. During the Relevant Period, Defendant Hull illicitly sold shares of 3D stock for proceeds of almost $2.6 million while in possession of material, adverse, non-public information, during a time in which 3D's stock was artificially inflated due to Defendants' false and misleading statements.  As a result of these illicit sales, Defendant Hull received direct financial benefits not shared with 3D's shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, Defendant Hull violated the Company's Code of Conduct and Insider Trading Policy.  Further, Defendant Hull is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales;

c. During the Relevant Period, Defendant Loewenbaum illicitly sold shares of 3D stock for proceeds of over $43 million while in possession of material, adverse, non-public information, during a time in which 3D's stock was artificially inflated due to Defendants' false and misleading statements.  As a result of these illicit sales, Defendant Loewenbaum received direct financial benefits not shared with 3D's shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, Defendant Loewenbaum violated the Company's Code of Conduct and Insider

Trading Policy.  Further, Defendant Loewenbaum is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales;

d.  During the Relevant Period, Defendant Moore illicitly sold shares of 3D stock for proceeds of over $1 million while in possession of material, adverse, non-public information, during a time in which 3D's stock was artificially inflated due to Defendants' false and misleading statements.  As a result of these illicit sales, Defendant Moore received direct financial benefits not shared with 3D's shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, Defendant Moore violated the Company's Code of Conduct and Insider Trading Policy.  Further, Defendant Moore is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales;

e.  During the Relevant Period, Defendant Van Riper illicitly sold shares of 3D stock for proceeds of over $1.4 million while in possession of material, adverse, non-public information, during a time in which 3D's stock was artificially inflated due to Defendants' false and misleading statements.  As a result of these illicit sales, Defendant Van Riper received direct financial benefits not shared with 3D's shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, Defendant Van Riper violated the Company's Code of Conduct and Insider Trading Policy.  Further, Defendant Van Riper is interested in a demand

because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales; and

    f.   During the Relevant Period, Defendant Kever illicitly sold shares of 3D stock for proceeds of over $1.5 million while in possession of material, adverse, non-public information, during a time in which 3D's stock was artificially inflated due to Defendants' false and misleading statements.  As a result of these illicit sales, Defendant Kever received direct financial benefits not shared with 3D's shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, Defendant Kever violated the Company's Code of Conduct and Insider Trading Policy. Further, Defendant Kever is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales.

**B.    There is Reason to Doubt the Independence of Defendants Reichental, <u>Hull, Diamandis, and Humes</u>**

82.    In addition to demand being excused due to his illicit insider sales, the principal professional occupation of Defendant Reichental is his employment with 3D as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the 2015 Proxy, Defendants have admitted that Defendant Reichental is not independent.  Thus, Defendant Reichental lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

83.    In addition to demand being excused due to his illicit insider sales, the principal

professional occupation of Defendant Hull is his employment with 3D (which he founded) as its Chief Technology Officer, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the 2015 Proxy, Defendants have admitted that Defendant Hull is not independent.  Thus, Defendant Hull lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

84.    Due to Diamandis' business relationships with other demonstrably interested directors, there is a reason to doubt that Defendant Diamandis could have independently considered a demand to commence and vigorously prosecute this action against them.   In particular, Defendant Diamandis is the Co-Founder & Executive Chairman of Singularity, which, according to the 2015 Proxy, the Board approved a $1 million partnership and sponsorship fee for in connection with becoming Singularity's Title Partner.  Thus, given that Diamandis has already and will continue to personally benefit as a result of his relationships with other demonstrably interested directors, demand is excused as to Defendant Diamandis; and

85.    Due to Humes' business relationships with other demonstrably interested directors, there is a reason to doubt that Defendant Humes could have independently considered a demand to commence and vigorously prosecute this action against them.   In particular, Defendant Humes is the CFO of Ingram Micro.  According to the 2015 Proxy, in 2014, the Company sold $506,428 worth of products to Ingram Micro, which also serves as one of the Company's distributors.  Thus, given that Humes has already and will continue to personally benefit as a result of his relationships with other demonstrably interested directors, demand is excused as to Defendant Humes.

**C.    Demand is Excused as to the Audit Committee Defendants Because They Face a Substantial Likelihood of Liability for Their Conduct**

86.    During the Relevant Period, Defendants Van Riper, Moore, and Curran served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.  Defendants Van Riper, Moore, and Curran breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.   Therefore, Defendants Van Riper, Moore, and Curran face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I

**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

87.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

88.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that 3D disseminated accurate, truthful, and complete information to its shareholders.

89.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to 3D shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of

prudent business judgment.

90.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

91.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company was operated in a lawful manner and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

93.     Defendants willfully ignored the obvious and pervasive problems with 3D's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

94.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of 3D.

97.     Plaintiff, as a shareholder and representative of 3D, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence 3D, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing 3D to misrepresent material facts regarding its business practices, financial position and business prospects.

100.     As a direct and proximate result of Defendants' abuse of control, 3D has sustained significant damages.

101.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT V

### AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

102.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.     Defendants had a duty to 3D and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of 3D.

104.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of 3D in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, Defendants breached their duties of due care, loyalty, good faith, and candor in the management and administration of 3D's affairs and in the use and preservation of 3D's assets.

105.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused 3D to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to 3D, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged 3D.

## COUNT VI

**AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

106.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    At the time of the stock sales set forth herein, the Insider Selling Defendants were in possession of material, adverse, non-public information described above, and sold 3D common stock on the basis of such information.

108.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.   It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold 3D common stock.

109.    At the time of their stock sales, the Insider Selling Defendants knew about the

direction the Company was heading and the negative financial impact that would ultimately have on the Company (and its stock price).  The Insider Selling Defendants' sales of 3D common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

110.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing 3D to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to 3D restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 6, 2015

**RIGRODSKY & LONG, P.A.**

By:   _/s/ Brian D. Long_
      Seth D. Rigrodsky (#3147)

**PROFY PROMISLOFF &**
   **CIARLANTO, P.C.**
Jeffrey J. Ciarlanto
Joseph M. Profy
David M. Promisloff
100 N 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642

Brian D. Long (#4347)
Gina M. Serra (#5387)
Jeremy J. Riley (#5791)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Phone: (302) 295-5310
Fax: (302) 654-7530

_Attorneys for Plaintiff_

**LAW OFFICE OF ALFRED G.**
   **YATES, JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

**3D SYSTEMS CORPORATION VERIFICATION**

I, Jason Booth, hereby verify that I am familiar with the allegations in the Complaint, that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: _8/3/2015_

Jason Booth _Jason A. Booth_